**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."  Although it is posted on the Internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5515-18

IN THE MATTER OF
INNOVATIVE SOLUTIONS
CORPORATION'S APPEAL OF
THE DENIAL OF APPLICATIONS
FOR INCENTIVE PAYMENTS
SUBMITTED UNDER THE NEW
JERSEY SMARTSTART
BUILDINGS PROGRAM.

_____

Submitted October 14, 2021 – Decided November 30, 2021

Before Judges Hoffman, Whipple and Geiger.

On appeal from the New Jersey Board of Public Utilities, Docket No. QC19020243.

Stuart P. Schlem, attorney for appellant Innovative Solutions Corporation.

Andrew J. Bruck, Acting Attorney General, attorney for respondent New Jersey Board of Public Utilities (Sookie Bae, Assistant Attorney General, of counsel; Matko Ilic, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner Innovative Solutions Corporation appeals from the July 10, 2019, order of the Board of Public Utilities (Board) denying its petition for financial incentives under the N.J. SmartStart Buildings Program (the program). We affirm.

Petitioner is a New Jersey corporation whose majority shareholder and sole full-time employee was Alok Jain (Jain) until Fall 2016, when his son, Anshul Jain (Anshul), completed his education and joined the company. Petitioner provides energy efficient light bulbs to individually owned hotels and motels in New Jersey under the program. The Board offers the program pursuant to the New Jersey Electric Discount and Energy Competition Act (EDECA), N.J.S.A. 48:3-49 to -98. The program provides financial incentives for non-residential customers of New Jersey utility companies who participate in the program to install energy efficient measures, including energy efficient light bulbs. TRC Energy Services Corporation (TRC) administers the program.

To be eligible to receive financial incentives, a participant must submit an application package to TRC before the participant installs equipment. See N.J. BD. OF PUB. UTILS., 002-FY14-04/14, NJ SMARTSTART BUILDINGS GAS COOLING APPLICATION (2014). "The package must include an application

signed by the customer; a complete (current) utility bill; and technology worksheet and manufacturer's cut sheets (where appropriate)." Ibid. If TRC approves the application package, the customer will receive an approval letter stating the estimated authorized incentive amount and the date by which the equipment must be installed. Ibid. The equipment may only be installed after receiving an approval letter. Ibid. All equipment must be purchased within twelve months of the date of the application. Ibid. After installation, the customer must submit a finalized invoice, with separate labor and material costs, and any additional documents requested in the application or initial approval letter. Ibid. Petitioner's payments were denied after installation, but we refer to this as denial of the whole application, pre- and post-installation, for incentives.

Petitioner has participated in the program as an agent or vendor for hotels and motels throughout New Jersey by obtaining applications from the hotels or motels and submitting the applications to the program administrator with the requisite documentation. Petitioner either installs the LED bulbs for the hotel or motel at no cost to the hotel or motel, or the hotel or motel installs the bulbs. No money is exchanged between the hotel or motel and petitioner. Petitioner submitted evidence to TRC that the light bulbs were installed, such

3

A-5515-18

as an invoice to the hotel or motel, indicating the quantity of light bulbs installed, the cost for each light bulb, and either no charge for the installation or that the hotel or motel installed the light bulbs themselves. The hotel or motel would provide a written statement confirming the installation of the light bulbs to be submitted to TRC. Upon approval, TRC would pay petitioner the cost of the light bulbs.

Participants in the program have one year to submit the required invoices and documentation in order to receive payment after installation. Between February 3, 2014, and June 29, 2015, petitioner submitted three applications, which are not on appeal. Unfortunately, during this time, Jain endured several serious health issues, which affected his physical and mental well-being, so petitioner did not submit the paperwork for eighteen applications, which are the subject of this appeal. At various points between March 27, 2015, and September 23, 2016, TRC denied the eighteen applications because petitioner did not provide the required documentation or request an extension prior to the applications' one-year expiration dates. TRC attached a chart to its ultimate denial letter on January 21, 2019, showing which required documents were either missing or received for each of the subject applications.

A-5515-18

In the Fall 2016, Jain's son, Anshul, completed his education, joined the business, and assumed Jain's responsibilities. In October 2016, Anshul began communicating with TRC regarding applications that had been cancelled due to inactivity. Anshul first inquired about the three earlier applications. TRC granted an extension on those applications, requesting copies of the applications and a doctor's note documenting Jain's medical conditions. Two applications were withdrawn. TRC paid one.

In December 2016, Anshul asked TRC about twenty-one applications cancelled due to inactivity, which included the eighteen applications on appeal. TRC responded, advising how petitioner could appeal and advised "[g]iven the significant number of rejections and the significant passage of time since they occurred, the facts will have to be especially extraordinary and well-supported."

In March 2017, Anshul sent TRC a letter appealing the cancellations and attached documentation of Jain's medical conditions. TRC denied the appeal stating:

> We begin by noting that we recognize [Jain] had some significant medical issues that might have justified some extension of [New Jersey's Clean Energy Program's] normal deadlines. Indeed, in October 2016, we granted your appeal seeking more time to

provide information for [three] projects that had been rejected in September 2016.

That said, the present appeal involves much more troubling facts. Specifically:

- According to your letter, your father had a series of health issues between December 12, 2013[,] and November 20, 2015, a [two]-year-long period that ended over a year ago.

- The last of the appealed projects was completed on November 20, 2015, well over a year ago.

- On January 3, 2017, you inquired about how to appeal the rejections of these projects. We told you how to, but cautioned that, to succeed, the relevant facts would have to be extraordinary and well-supported given the number and age of the rejections.

- Despite the above, it still took more than [two] more months for the present appeal to be filed.

- Although there is some indication [Jain] may still be under continuing care for a continuing issue, it's been over [three] years since it was known that his health issues were likely to interfere with his ability to run the business and more than a year, and probably substantially longer, since his condition became reasonably stable.

The [p]rogram has administrative deadlines for many reasons, including its need for accurate budgetary forecasting. For good cause shown, where the delays are relatively minor, the reasons for them are excusable and reasonable, and the applicant is proceeding diligently to reduce the delays and their effects, we will consider granting relatively minor extensions. The present case is not such a case. The

6

delays and requested extensions are much longer than usual. The health problems that contributed to the delays do not seem to be of the type that would excuse such long delays. The attempts to deal with [the] situation have been dilatory at best. Accordingly, our present thinking is that we should deny this appeal.

However, if you think we are mistaken or that we should consider other facts, documents, or arguments, you should submit them to us by <u>March 27, 2017</u>.

Anshul submitted a follow-up appeal letter with supporting documents.

TRC granted petitioner's appeal to reactivate the applications on March 28, 2017, but stated:

We remain extremely concerned about the dilatoriness involved in this appeal, as detailed in our March 13, 2016 email below. However, we are compassionate and sympathetic to your father's medical condition and the fact that you were a student during the relevant times. We accordingly have GRANTED this appeal to reactivate [the applications that are the subject of this appeal] . . . and to allow further processing of them on the following conditions, <u>all of which must be satisfied by April 28, 2017</u>. If any of the following conditions are not met by April 28, 2017, the applications will be cancelled.

. . . .

The conditions for further processing and possible approval are that for each application you must submit to the Program Manager, in a form acceptable to the Program Manager, all of the following:

1. The final invoice actually submitted to the customer.

2. Documentation that the invoice was paid and of the date of payment (i.e., copy of customer's cancelled check or copy of bank statement showing receipt/deposit of the payment)[.]

3. The date(s) installation commenced and was completed (e.g., work orders, time sheets, construction logs).

4. A signed statement from the customer, on the customer's letterhead, certifying the date(s) installation commenced and was completed.

5. A valid Tax Clearance Certificate.

6. Any other information or documentation the Program Manager requires.

Although these requirements were called "enhanced requirements," a valid Tax Clearance Certificate, an invoice for the purchase of the equipment, and proof of payment (in the form of a "finalize[d]" invoice) are normally required for the application. The requirements were "enhanced" in that TRC required petitioner to submit the "final invoice actually submitted to the customer," as well as additional proof of payment, "i.e., copy of customer's cancelled check or copy of bank statement showing receipt/deposit of the payment," and "[a] signed statement from the customer, on the customer's letterhead, certifying the date(s) installation commenced and was completed."

On April 28, 2017, Anshul sent the program manager an email containing the requested documents, except for the Tax Clearance Certificates for two applications. Anshul told TRC, "[a]fter repeatedly contacting the tax office and the [taxpayer], the state still hasn't given [the Tax Clearance Certificates] to us yet." Anshul later sent the Tax Clearance Certificate for one of the applications to TRC on May 1, 2017.

On May 10, 2017, TRC advised Anshul by email that the applications were denied because of missing required documents, explaining that "none of the close-out submissions contained the information requested in item [two] (Proof of Payment) and [four] (Signed statement from customer on their letterhead)." Further, multiple applications were missing Tax Clearance Certificates or included Tax Clearance Certificates that were either expired or had incorrect names that did not match the utility bills for that application. Also, multiple applications included invoices that listed a different LED product than originally approved without proof of Energy Star qualification.

On November 30, 2018, petitioner submitted an appeal to the Appeal Committee of the Board. On December 17, 2018, TRC denied petitioner's request to re-open the applications by email to Anshul, stating "[w]e have DENIED your request to re-open this matter because we have given your

company numerous chances to complete the allegedly open applications, your responses have been dilatory at best, and your latest response still has not provided complete, current, and accurate application information." The program administrator further stated:

> This matter has been going on for at least [five] years -- the application for #24148 was received by the Program Manager on December 16, 2013. By contrast, the SmartStart program was designed and is financed so that applications should be completed in no more than [one] or [two] fiscal years. Projects that extend longer, among other things, either tie[]up financing that could be used for other more productive projects or, if their commitments have been released, cause budgetary problems in the years in which they are paid.

On February 19, 2019, petitioner filed a petition with the Board to contest the denials of eighteen applications and requested a formal hearing. On July 10, 2019, the Board denied petitioner's appeal without a hearing. This appeal followed.

Our review of an agency's final administrative determination is limited. In re Carter, 191 N.J. 474, 482 (2007). We do not ordinarily overturn such determinations "in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence." Ibid. (quoting

Campbell v. Dep't of Civ. Serv., 39 N.J. 556, 562 (1963)).  In reviewing an agency's final administrative determination, the court considers:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995) (citing Campbell, 39 N.J. at 562).]

We are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue," Mayflower Sec. Co. v. Bureau of Sec. Div. of Consumer Affs. Dep't of Law & Pub. Safety, 64 N.J. 85, 93 (1973), but we give great weight to "[a]n administrative agency's interpretation of a statute it is charged with enforcing," In re Saddle River, 71 N.J. 14, 24 (1976). Moreover, we give great deference to an agency's "interpretation and implementation of its rules enforcing the statutes for which it is responsible." In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488-89 (2004). "Where an agency's expertise is a factor, a court defers to that expertise, particularly in cases involving technical matters within the agency's special

competence." In re Adoption of Amends. to the Ne., Upper Raritan, Sussex Cty. & Upper Del. Water Quality Mgmt. Plans, 435 N.J. Super. 571, 583 (App. Div. 2014).

The SmartStart Buildings Program's terms and conditions state the process for post-installation approval:

> After installation is completed, the [c]ustomer, or an agent authorized by the [c]ustomer, must finalize and submit an invoice for the purchase of the equipment (material cost must be broken out from labor costs), and any other required documentation as specified on the equipment application or in the Program Manager's initial approval letter.
>
>    . . . .
>
> The Program Manager reserves the right to verify sales transactions and to have reasonable access to [p]articipating [c]ustomer's facility to inspect both pre-existing product or equipment (if applicable) and the Energy-Efficient Measures installed under this Program, either prior to issuing incentives or at a later time.
>
> [N.J. BD. OF PUB. UTILS., 002-FY14-04/14, NJ SMARTSTART BUILDINGS GAS COOLING APPLICATION (2014) (emphases added).]

When a customer misses the deadline, TRC sends them an expiration letter, which details the procedure for obtaining an extension. If the installation is in progress or completed, the customer has thirty days to either

12

request an extension or submit the required paperwork. Extension requests must be in writing from the customer and include the circumstances that led to the extension request, the percentage of the project completed, and must not be for longer than six months. Moreover, a program participant may request a formal hearing regarding an application pursuant to N.J.A.C. 14:1-1.5. The request must meet the form and content requirements of N.J.A.C. 14:1-5.1(a), which states:

> All petitions shall comply with the provisions of N.J.A.C. 14:1-4 to the extent applicable; shall clearly and concisely state the facts and relief sought; shall cite by appropriate reference the statutory provision or other authority under which the Board's action is sought; and in addition, shall contain such information or statements as are required by provision of the statute and the applicable provision of these rules, or such other rules or orders adopted by the Board pertaining to certain petitions, or as may be required by the Board in a particular proceeding.
>
> [N.J.A.C. 14:1-5.1(a).]

Under the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -31, "[i]n a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice." N.J.S.A. 52:14B-9(a). The APA defines a "contested case" as a

> proceeding . . . in which the legal rights, duties, obligations, benefits or other legal relations of specific

13

> parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing . . . .

[N.J.S.A. 52:14B-2.]

However, "where no disputed issues of material fact exist, an administrative agency need not hold an evidential hearing in a contested case. The mere existence of disputed facts is not conclusive. An agency must grant a plenary hearing only if material disputed adjudicative facts exist." Frank v. Ivy Club, 120 N.J. 73, 98 (1990) (alteration in original) (citations omitted).

Petitioner argues that the Board's decision was arbitrary and capricious because petitioner "substantially complied with the demands to the extent possible." Specifically, petitioner contends that each of the subject applications included the documents required as set forth in the form applications and that TRC's request that each hotel provide a signed customer statement on company letterhead is unreasonable because fifteen of the hotels involved here "were individually owned franchises which did not have letterheads with logos." Petitioner also argues that it was arbitrary and capricious for the Board to deny the applications on the grounds that multiple applications were missing Tax Clearance Certificates or included Tax

14

Clearance Certificates that were either expired or had incorrect names that did not match the utility bills for a particular application, since those entities changed names after installation was completed. Finally, petitioner argues that it was arbitrary and capricious for the Board to deny the applications on the grounds that four of the applications involved light bulbs that either did not match the products listed in the initial application, or that were no longer considered Energy Star qualified. Petitioner also argues that had it been afforded a formal hearing it could have demonstrated that the light bulbs were Energy Star qualified. We disagree.

A review of the submitted documents shows that at least one of the required documents is missing for each of the eighteen applications that are the subject of this appeal. This is true even if the non-letterhead customer statements that petitioner provided were considered proper proof of payment. Petitioner submitted customer statements from each of hotels as "proof of payment"; the statements, however, do not state that payment was made. Even if these statements were accepted as proof of payment, at least one outstanding required document for each of the applications remained.

But TRC did, at least in part, deny many of the applications because the customer statements for those applications were not on company letterheads.

A-5515-18

This enhanced requirement that petitioner submit a signed customer statement on company letterhead certifying the dates that installation commenced and was completed was imposed for the purpose of verifying that the hotel, and not petitioner itself, was the one certifying that installation took place on the particular date. This requirement was not unreasonable considering that on March 18, 2017, when TRC imposed this requirement, the applications were between two and three years old.

It was not arbitrary or capricious to impose "enhanced requirements" in this case because of the lengthy delays involved. As TRC explained to Anshul on March 13, 2017, "[t]he Program has administrative deadlines for many reasons, including its need for accurate budgetary forecasting." The enhanced requirements also comport with the program terms and conditions, which provide that "[t]he Program Manager reserves the right to verify sales transactions and to have reasonable access to Participating Customer's facility to inspect both pre-existing product or equipment (if applicable) and the Energy-Efficient Measures installed under this Program, either prior to issuing incentives or at a later time." Thus, the Board's actions did not violate express or implied legislative policies, and the record contains substantial evidence to support the findings on which the Board based its action. Accordingly, the

16

Board's decision was not arbitrary or capricious agency action, see Mazza, 143 N.J. at 25, so we have no reason to interfere with the denials.

Finally, petitioner argues that the Board's failure to conduct a hearing unfairly prejudiced petitioner because a hearing would have allowed petitioner to explain its position. As stated above, "where no disputed issues of material fact exist, an administrative agency need not hold an evidential hearing in a contested case." Frank, 120 N.J. at 98. Importantly, "bald allegations or naked conclusions . . . are insufficient to require an agency head to transmit the matter . . . as a contested case." J.D. ex rel. D.D.H. v. N.J. Div. of Developmental Disabilities, 329 N.J. Super. 516, 525 (App. Div. 2000). Petitioner has not identified material disputed adjudicative facts that would require an evidentiary hearing; rather, petitioner merely asserts that it could have explained the issues which formed the basis of the Board's action.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5515-18